IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RAMONA N. CHRISTY,

        Plaintiff,

v.                                           Civil Action 2:19-cv-136
                                                Judge George C. Smith
                                                Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Ramona N. Christy, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

    **I.**    **BACKGROUND**

Plaintiff filed her application for DIB February 4, 2010, alleging that she was disabled beginning January 13, 2010. (Tr. 305–06). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on May 1, 2012. (Tr. 98–143). On August 30, 2012, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 147–65).

The Appeals Council remanded the case to the Administrative Law Judge in an order dated September 25, 2014. (Tr. 166–70). Another administrative hearing was held on January 15, 2015, (Tr. 37–97), and the ALJ issued an unfavorable decision on May 6, 2015. (Tr. 11–36). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision

of the Commissioner. (Tr. 1–5). Plaintiff then filed a case in this Court. On August 23, 2017, Judge George C. Smith remanded the case back to the administrative level. (Tr. 1237).

A third administrative hearing was held on August 7, 2018. (Tr. 1171–1200). After which, the ALJ issued an unfavorable decision. (Tr. 1143–70). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

Plaintiff filed the instant case seeking a review of the Appeals Council's decision on January 15, 2019 (Doc. 1), and the Commissioner filed the administrative record on April 8, 2019 (Doc. 7). Plaintiff filed her Statement of Errors (Doc. 10) on June 4, 2019, and Defendant filed an Opposition (Doc. 16) on September 18, 2019. No reply was filed. Thus, this matter is now ripe for consideration.

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity from January 13, 2010, her alleged onset date, through her date last insured. (Tr. 1149). He found that Plaintiff suffers from the following severe impairments: chronic myofascial pain syndrome with a history of multiple abdominal surgeries, chronic referred lower back pain, sacroiliac dysfunction, left ankle arthritis, depression, and anxiety. (Tr. 1150). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequent climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, frequent stooping, bending, squatting, frequent operation of foot controls, occasional exposure to unprotected heights, retains ability to understand, remember and carry out simple, repetitive tasks, able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

(Tr. 1151).

A. **Relevant Hearing Testimony**

The ALJ summarized the testimony from Plaintiff's hearing:

At the hearing, the claimant testified that she had difficulty with focusing and was unable to read like she used to. She stated that she had constant pain. She described the pain as a sharp and stabbing pain and an achiness in her left side. The claimant said that she has balance difficulties but only used an assistive device after her ankle surgery. She stated that she has had injections and physical therapy in her spine. The claimant testified that heating pads helped her and that she was using a heating pad 18 hours out of 24 hours in a day. The claimant also testified about abdominal pain. She explained that often her abdominal pain would cause her to be "doubled over." She stated that she received a pains stimulator for abdominal pain and it improved by fifty percent. The claimant testified that she has swelling in her left ankle and needs to elevate her left up to three hours a day. She related that her ankle felt hollow and ache[d] and surgery did not help her ankle. The claimant testified that she has trouble concentrating. She explained that she could concentrate for about fifteen minutes at a time and often forgot what she was doing. The claimant testified that she had good days and bad days and that on her bad days she would be in bed most of the time. She stated that she had about four bad days a week.

(Tr. 1152).

B. **Relevant Medical Evidence**

The ALJ also usefully summarized Plaintiff's medical records and symptoms:

The record shows that the claimant had pain but [] responded to treatment and had generally normal findings on examinations. On January 7, 2010, the claimant was treated at the emergency room due to left-sided abdominal pain (Exhibit 21F/ l). She was treated with medication for chronic abdominal pain (Exhibit 21F/2). The claimant presented to the emergency room on January 12, 2010 complaining of abdominal pain (Exhibit 3F/14). In a physical examination, the claimant had unrestricted range of motion in all extremities, normal muscle tone and movement and no report of muscle weakness (Exhibit 3F/15). The claimant had tenderness to palpation of her abdomen and was diagnosed with abdominal pain and chronic pelvic pain (Exhibit 3F/l7). Treatment notes show that she had a history of multiple abdominal surgeries related to hysterectomy, endometriosis and lysis of multiple adhesions (Exhibits 3F/ 16, 4F/8, SF). On January 13, 2010, the claimant reported that her abdominal pain had been getting worse through that month. While testing was negative, the claimant requested hospital admission due to her pain (Exhibit 4F/6, 14). The claimant was discharged on January 19, 2010 with a diagnosis of abdominal pain due to adhesions (Exhibit 4F/l7).

On January 28, 2010, the claimant followed up with Donald LeMay, D.O., and reported ongoing abdominal pain (Exhibit 4F/ 19). On examination, the claimant

appeared in no acute distress, had significant tenderness in the lower abdominal quadrant and was diagnosed with chronic pain secondary to adhesions versus endometriosis (Exhibit 4F/19). Dr. LeMay recommended that she follow up with a pain specialist (Exhibit 4F/19). The claimant met with Tommaso Falcone, M.D., in April 2010 to further evaluate her abdominal complaints and he did not recommend surgery (Exhibit 6F/1). She had a consultative visit at the Comprehensive Spine Center on May 6, 2010 (Exhibit l F/25). The claimant discussed trying nerve blocks for the pain (Exhibit llF/26).

On September 7, 2010, the claimant had a follow up appointment after having two left ilioinguinal nerve blocks (Exhibit 9F/l). She stated that the injections did not help her pain but also she was able to take a weekend trip to the lake (Exhibit 9F/ l). The claimant visited the emergency room on September 26, 2010 complaining of left sided abdominal pain (Exhibit l0F/6). On examination, the claimant had full range of motion and strength in her extremities with only some generalized tenderness in the abdomen (Exhibit l0F/7). An acute abdominal series was normal with a nonobstructed pattern (Exhibit 14F/2). On October 18, 2010, the claimant was treated at a pain management clinic and reported that she had moderate to severe pain that was aggravated by sitting, standing, walking and bending but was relieved by heat (Exhibit 16F/l). On examination, the claimant had a normal gait, normal range of motion and normal stability of the spine (Exhibit 16F/2). A colonoscopy revealed that the claimant had some small internal hemorrhoids but otherwise normal findings (Exhibit 23F). In an October 25, 2010 office visit, the claimant had generally normal findings (Exhibit llF/l). She was diagnosed with chronic abdominal pain (Exhibit l1F). In follow up appointment on November 18, 2010, the claimant reported that she had "tolerable pain relief" with her medication but that she was sleepy and dizzy. The claimant described the pain as constant and cramping and radiating to the back and left leg (Exhibit 16F/9). The claimant subsequently underwent two ilioinguinal nerve blocks (Exhibit 16F/11). When she returned to the pain clinic she reported that the first injection helped but that the second one did not (Exhibit 16F/13).

On February 18, 2011, the claimant underwent a percutaneous implantation of a nerve stimulator (Exhibit 16F/l7). The claimant returned to the pain clinic the next week and reported that her pain was improved slightly (Exhibit 16F/19). On examination, the claimant had a normal gait, positive straight leg raise to the left but normal motor examination and no tenderness to palpation of the lumbar spine (Exhibit 16F/21). In April 2011, the claimant reported that she had not had much improvement in the past month (Exhibit 33F/28). The claimant followed up in June 2011 and reported that her abdominal pain was moderately improved (Exhibit 33F/25).

In addition to her abdominal pain, the claimant also has been treated for back and ankle pain. Due to complaints of back pain, the claimant was treated with pain medication and steroid injections in March 2011 (Exhibit 34F). At that time, Gladstone McDowell II, M.D., assessed that the claimant had mechanically

4

referred back pain and he recommend medial branch block (Exhibit 34F/29). In a May 2, 2011 examination, the claimant was found to have full flexion but a positive Kemp's test on the left with lumbar paraspinous tenderness and a negative straight leg raise (Exhibit 34F/29). In July 2011, Dr. McDowell assessed that the claimant had sacroiliac dysfunction (Exhibit 34F/22).

A lumbar spine CT taken on September 13, 2011 revealed that the claimant had *mild* levoscoliosis and *no significant* posterior disc disease, central canal or neuroforaminal stenosis (Exhibit 26F). The claimant had several epidural steroid injections for her reported back pain but did not report significant improvement (Exhibits 33F/l, 34F). The claimant had a full physical examination due to her lower back pain (Exhibit 33F). The claimant demonstrated an antalgic gait and had limited range of motion due to pain (Exhibit 33F/2). On November 14, 2011, the claimant followed up after an SI injection (Exhibit 34F/l). On examination, she had a slightly flexed and antalgic gait, but normal range of motion of the lumbar spine and a negative straight leg raising test (Exhibit 34F/3). The claimant was assessed to have chronic intractable mechanical referred back pain and sacroiliac dysfunction (Exhibit 34F/3). At a follow up appointment, the claimant reported generalized lower lumbar spine pain (Exhibit 37F/l).

An October 18, 2011 CT of the left lower extremity showed that the claimant had osteochondral defect within the medial left talar dome (Exhibit 27F/l). The claimant underwent a talar allograft of the left ankle and in a December 6, 2011 post-operative check, the claimant was found to have no signs of infection (Exhibit 30F/l). At a one month post-operative check, the claimant was found to have good bony alignment (Exhibit 32F).

In December 2011, Dr. Gladstone discussed treatment options with the claimant for her back pain, including medication management and chiropractor rehabilitation (Exhibit 38F/5). However, on examination, the claimant had normal range of motion, and normal strength (Exhibit 38F/5). The claimant was treated at the emergency room on January 2, 2012 due to reported back pain (Exhibit 3l F). On examination, the claimant was able to walk without assistance but with some difficulty. The examination showed only mild to moderate decrease in lumbosacral movement with no specific sensory findings, and normal reflexes (Exhibit 3l F/2). It was determined that she had a muscle strain that would take only several weeks to heal (Exhibit 31F/3).

On January 5, 2012, the claimant received trigger point injections (Exhibit 38F). The claimant initiated treatment with Donald LeMay, M.D., on January 9, 2012 (Exhibit 40F/2). She also continued treating with Dr. McDowell (Exhibit 43F/23). On January 20 2012, Dr. McDowell noted that the claimant was better able to perform household and work duties because of improved pain control (Exhibit 43F/21). On February 20, 2012, Dr. LeMay found that the claimant had no new complaints of back pain (Exhibit 40F). She stated that she was using zanaflex and a new pain patch and her ankle was also progressing. A July 26, 2012 CT of the

pelvic showed only slight facet degenerative changes in the lower lumbar spine but was otherwise normal (Exhibit 41F). In an October 12, 2012 examination with Dr. LeMay, the claimant was found to have a normal gait, normal flexion, extension and side bending, normal strength and a negative straight leg raise (Exhibit 42F). The claimant was to increase activities as tolerated (Exhibit 42F). She also continued to use medications and injections (Exhibit 43F).

At a July 16, 2012 appointment with Dr. Gladstone, the claimant stated that her pain was constant and aching and aggravated by bending, walking, standing and sitting for long periods but alleviated by heat (Exhibit 43F/10). On examination, the claimant had a slightly flexed gait, lumbar spine was noted to be stable with some limited extension and a negative straight leg raising test (Exhibit 43F/12). In October 2012, the claimant reported 50% less pain due to her medial branch blocks (Exhibit 43F/2). In a January 2013 follow up visit with Dr. McDowell, the claimant reported pain but also noted that she had adequate relief with her current pain medications (Exhibit 48F/4). She was given trigger point injections (Exhibit 48F). The claimant treated with Dr. LeMay on March 20, 2013 and reported some pain on the left flank and back but denied any numbness, tingling, or weakness radiating to the lower extremities. On examination, she had normal gait, normal strength and a negative straight leg test (Exhibit 45F/4). At a February 7, 2014 visit, the claimant reported that she had been doing a home exercise program which had included working out at the gym in the recent past, but had not been going to physical therapy (Exhibit 45F/2).

The claimant met with her orthopedic surgeon on October 15, 2014 and reported that she had chronic left ankle pain (Exhibit 47F/3). However, she explained that the pain did not prevent her from doing most activities that she wanted to do (Exhibit 47F/3). An October 2014 CT of the left lower extremity showed postsurgical changes and some degenerative changes but no evidence of inflammatory arthropathy (Exhibit 46F/2). She was told that arthritis would get worse over time and that she was to use a brace and steroid injections based on how much pain she had (Exhibit 47F/ l).

The claimant met with Dr. McDowell on October 6, 2014 to discuss receiving a series of injections for her lower back pain (Exhibit 48F/7). Treatment notes from February 23, 2015 indicate that Dr. McDowell planned to continue to conservative treatment (Exhibit 49F/59). On September 10, 2015, the claimant established care with Dr. Ligas and reported that she had chronic back pain and treated with a pain specialist on occasion (Exhibit 52F/53). On examination, the claimant had normal range of motion and exhibited no edema (Exhibit 52F/54). She was told to continue her therapies for pain and return in six months.

(Tr. 1152–57).

### C. The ALJ's Decision

After reviewing the hearing testimony and medical record, the ALJ concluded that

Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were "somewhat inconsistent with the record." (Tr. 1152).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff asserts two assignments of error. First, Plaintiff argues that the ALJ failed to provide good reasons for not assigning controlling weight to the opinions of her treating physician, Dr. Lemay. (Doc. 10 at 7–12). Second, Plaintiff asserts that the ALJ improperly determined that Plaintiff's obesity was not a medically determinable impairment. (Doc. 10 at 12–14).

### A. Dr. LeMay's Opinion

Plaintiff relies on the opinion of her treating physician, Dr. LeMay, to argue that the ALJ erred. Two related rules govern how the ALJ was required to analyze Dr. LeMay's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r*

*of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Most critically, Plaintiff relies on a residual functional form that Dr. LeMay completed on January 9, 2012. (Doc. 10 at 9; *see* Tr. 1013–20). Dr. LeMay assessed Plaintiff's abilities to lift, carry, sit, stand, and walk as limited. (Tr. 1014–15). Specifically, Dr. LeMay limited Plaintiff to carrying and lifting no more than 5 pounds, standing and walking for no more than 2–4 hours total and 1 hour at a time, and could only sit for up to 4 hours and for no more than 1 hour at a time. *Id*. Dr. LeMay then limited Plaintiff to occasional climbing, stooping, and kneeling, and precluded Plaintiff from crouching or crawling. (Tr. 1015). Dr. LeMay additionally opined that Plaintiff would be impacted by the pain involved in reaching, pulling, and pushing. (Tr. 1016).

In considering Dr. LeMay's opinion, the ALJ expressly discussed the residual functional form that the doctor had completed:

> Dr. LeMay completed a residual functional form for the claimant on January 9, 2012 (Exhibit 39F). He set forth functional limitations for the claimant such as limiting her to lift/carry up to five pounds and noting that she could sit for less than an hour at a time and stand/walk less than an hour at a time. He reported that these limits were "supported by documented clinical findings through radiographic imaging and surgical consultations" (Exhibit 39F). However, the undersigned assigns his opinion little weight as it is generally not consistent with evidence as a whole. For instance, imaging does not document significant abnormalities and Dr. LeMay's records also do not contain abnormal physical findings that support these limitations. Notably, Dr. LeMay conducted his initial evaluation on the claimant the same day he completed the form. In that evaluation, he found that the claimant was well appearing and in no apparent distress [] (Exhibit 40F/2). He further found that the claimant had no edema and normal pulses. He did note that he reviewed her history and she was only three weeks out from her ankle surgery (Exhibit 40F/2). Thus, his limitations were based on a one-time evaluation shortly after surgery. Accordingly, they have been afforded little weight.

(Tr. 1157).

Plaintiff criticizes this analysis as a misunderstanding of Dr. LeMay's relationship with Plaintiff. (Doc. 10 at 10). In particular, Plaintiff asserts that the ALJ "seemed to believe that Dr. LeMay evaluated [Plaintiff] for the first time on January 9, 2012[.]" (*Id.*). But the ALJ's opinion

9

shows that he did not have this misunderstanding. Throughout the opinion, the ALJ cited Dr. LeMay's records, including opining about a record that pre-dated the January 2012 evaluation: "On January 28, 2010, [Plaintiff] followed up with Donald LeMay, D.O. . . ." (Tr. 1153). The Undersigned considers the ALJ's entire analysis. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (recognizing that the ALJ's decision should be read as a whole). And the best read of the ALJ's opinion is that he understood that Dr. LeMay had treated Plaintiff before.

More to the point, the ALJ's evaluation of Dr. LeMay's opinion was consistent with regulations and has record support. For instance, the ALJ reasonably considered that no radiographic imaging supported Dr. LeMay's opinion—even though Dr. LeMay stated that such evidence existed. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give to that opinion"). Relatedly, the ALJ noted that Dr. LeMay's own treatment records did not contain abnormal physical findings that would support the opined limitations. (Tr. 1157). Additionally, the ALJ relied on Dr. LeMay's records after he completed the residual functional form. These records support the ALJ's conclusion that Plaintiff was less limited that Dr. LeMay had opined. For example, in February 2012, Dr. LeMay found that Plaintiff had no new complaints of back pain; was using a muscle relaxer and a new pain patch; and that her ankle was also progressing from her ankle surgery in December 2011. (Tr. 1154). Roughly eight months later, in October 2012, Dr. LeMay's physical exam showed Plaintiff had normal gait, normal flexion, extension, and side bending, normal strength, and a negative straight leg raise (Tr. 1154, (citing 1022–23)). Of note, Plaintiff was to increase activities as tolerated. (*Id.*). The ALJ acknowledged that Plaintiff reported some pain on the left flank and back during a visit with Dr. LeMay in March 2013, but exam findings showed normal gait, normal strength, and negative straight leg raise, and

10

she denied any numbness, tingling, or weakness radiating to the lower extremities. (Tr. 1155 (citing 1052)). Then, in February 2014, Plaintiff reported to Dr. LeMay that she had been doing a home exercise program which included working out at the gym in the recent past, but she had not been going to physical therapy. (Tr. 1155 (citing 1050)).

All told, the ALJ reasonably considered the record when discounting the residual functional form that Dr. LeMay completed, and substantial evidence supports the ALJ's decision. *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175–76 (6th Cir. 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion.").

**B. Obesity**

Plaintiff next argues that the ALJ erred in evaluating her obesity. Social Security Ruling (SSR) 02-01p provides to the ALJ "guidance on SSA policy concerning the evaluation of obesity in disability claims filed under titles II and XVI of the Social Security Act." *See* SSR 02-01. The Ruling explains that the Agency will consider obesity throughout the sequential process, including in determining whether Plaintiff has severe impairments, whether her impairments meet or equal the listings, and in assessing Plaintiff's RFC. *Id.* The Sixth Circuit has recognized "[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (citation and internal quotations omitted) ("Social Security Ruling 02-01p does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation."). Importantly, the Ruling provides that obesity "may or may not increase the severity or functional limitations of the other impairment."

SSR 02-01.

In support of her argument that "the record clearly documents" her obesity, Plaintiff cites the following records: Tr. 568, 573, 577, 580–81, 583, 588, 592, 604, 793, 1113, 1117. (Doc. 10 at 13). The Undersigned has reviewed the records, and, by and large, they simply state Plaintiff's height and weight—and, at times, her body mass index. *See, e.g.*, 568, 580 (listing only height and weight). The only record that narratively discusses her weight says: Plaintiff is "slightly obese." (Tr. 583). Plaintiff has identified no records that link work limitations to Plaintiff's obesity. In addition, the record shows that Plaintiff did not argue before the ALJ that her obesity impaired her ability to work in any way.

Plaintiff's assertion of obesity as an impairment for the first time at this stage is similar to what the Plaintiff did in *Sebastian v. Comm'r of Soc. Sec.*, No. 1:13-cv-792, 2014 U.S. Dist. LEXIS 135489 (W.D. Mich. Sept. 3, 2014). The Court explained: "Here, the ALJ did not address plaintiff's obesity. This is understandable because plaintiff did not claim obesity as an impairment in her original disability report or her disability report on appeal. Nor did plaintiff present testimony at her administrative hearing with respect to limitations caused by her obesity." *Id.* at *15 (citations omitted). As a result, the Court concluded that obesity was "not part of plaintiff's claim" and denied relief. *Id.* at *16.

The same is true here. Obesity was not part of Plaintiff's claim below. Further, Plaintiff has not shown this Court records demonstrating that her obesity impaired her ability to work. As such, the ALJ did not err.

IV.     CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: December 12, 2019

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE